IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHERYL STRICKLAND,           )
   PLAINTIFF,              )
   v.                      )   CV-03-H-1128-S
                           )
PROVIDENT LIFE and ACCIDENT  )
INSURANCE COMPANY,           )
   DEFENDANT.              )

ENTERED
AUG - 3 2004

**MEMORANDUM OF DECISION**

    The Court has before it the May 13, 2004 motion of Defendant Provident Life and Accident Insurance Company ("Provident") for summary judgment. Pursuant to the Court's May 17, 2004 order, the motion was deemed submitted for decision, without oral argument, on June 21, 2004.

### I.  Procedural History

    Plaintiff Sheryl Strickland commenced this action on April 9, 2003 by filing a complaint in the Circuit Court of Jefferson County, Alabama, stating bad faith breach of an insurance contract under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. (See Compl. ¶¶ 2, 3.) On May 14, 2003 defendant Provident filed a notice of removal in this court, stating that removal was proper under 28 U.S.C. § 1441, 28

U.S.C. § 1331, and 29 U.S.C. § 1132(e)(1), since Plaintiff's claims arise out of and relate to an ERISA welfare benefit plan. Defendant's May 13, 2004 motion for summary judgment asserts that no genuine issue of material fact exists and that defendant is entitled to judgment as a matter of law. (See generally Def.'s Mot. Summ. J.)

On May 13, 2004, defendant submitted evidence[1] in support of the motion, including a factual submission and legal argument. Plaintiff submitted evidence[2] in opposition to the motion on June

---

[1] Defendant submitted: (1) as Exhibit "A," the original Complaint and the First Amended Complaint; (2) as Exhibit "B," the Answer filed in this court; (3) as Exhibit "C," copies of Provident's file pertaining to the claim of Sheryl Strickland.

[2] Plaintiff submitted: (1) as Exhibit "1," Provident's "Group Long Term Disability Insurance Policy" and excerpts from the file pertaining to the claim under that policy of Sheryl Strickland; (2) as Exhibit "2," copies of correspondence between Provident and claimant Sheryl Strickland; (3) as Exhibit "3," a copy of the July 16, 2001 letter from Dr. Emily S. Riser concerning Sheryl Strickland's medical condition and limitations; (4) as Exhibit "4," a copy of the June 17, 2002 letter from Dr. Emily S. Riser concerning Sheryl Strickland's medical condition and limitations; (5) as Exhibit "5," a copy of the July 3, 2003 letter from Dr. Cheryl R. Goyne concerning Sheryl Strickland's medical condition and limitations; (6) as Exhibit "6," a copy of Dr. Cheryl R. Goyne's assessment/plan for Sheryl Strickland; (7) as Exhibit "7," a copy of the July and August 2002 medical opinion re: ability of Sheryl Strickland to perform work-related duties; (8) as Exhibit "8," the January 2002 clinical review request pertaining to Sheryl Strickland; (9) as Exhibit "9," the request for additional review of the claimant's medical condition; (10) as Exhibit "10," the opinion of Dr. Robert C. Coddington as related to the claim of Sheryl Strickland; (11) as Exhibit "11," the additional conclusions of Dr. Robert C. Coddington; (12) as Exhibit "12," the August 2002 review by Karen York, RN, of Strickland's claim; (13) as Exhibit "13," Dr. Goyne's notes regarding the condition of Strickland; (14) as

7, 2004 and on the same date filed an opposing brief. All of these briefs, along with the submitted evidence, have been considered.

**II. Standards for Evaluating a Summary Judgment Motion**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc.,

---

Exhibit "14," the October 2002 review of Strickland's condition by Karen York, RN; (15) as Exhibit "15," the opinion of Dr. Robert A. Hill concerning Strickland's condition.

477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. See Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce

affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. See <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. See <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996)

(citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III.   Relevant Undisputed Facts[3]

Plaintiff Sheryl Strickland was insured for Long Term Disability with defendant Provident through a group policy (number 122165-01) issued to her employer, Alabama Power Company. (<u>See</u> Ex. A., Compl. and Amend. Compl.; <u>see also</u> Ex. B., Answer.) Strickland was employed at Alabama Power Company as a Customer Service Representative.[4]  (<u>See</u> Ex. A., ¶ 1.)

On January 16, 2001 Strickland underwent a C5-6 anterior cervical diskectomy and fusion after being diagnosed with a herniated disc.  (<u>See</u> Ex. C., September 23, 2002 letter of Provident to Strickland.)  On February 13, 2001 Dr. Swaid N. Swaid, who performed the surgery, entered a progress note stating: "The patient is doing well post-operatively.  Her symptoms are improving . . . The wound is healing well and the c-spine x-ray shows good evidence of anterior diskectomy and interbody fusion with satisfactory placement of bone plugs and the fusion is incorporating well.  I do believe she would benefit

---

[3] If the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115.

[4] No evaluation or listing of Strickland's duties as customer service representative has been compiled or reviewed, as evidenced by the record.  (<u>See</u> Pl.'s Brief and Evidentiary Submission in Opp'n. to Def.'s Motion for Summ. J. at 2.)

from physical therapy to the cervical spine[5] . . . for two to three weeks. The patient is given further post operative instructions, and will be discharged from our care at the completion of therapy and may return on a prn basis." (Id.)

Dr. Emily Riser, Strickland's attending neurologist, treated the Plaintiff post-operative. (See Ex. C., Feb. 15, 2001 letter of Riser.) In a letter dated February 15, 2001 Dr. Riser states that Strickland is "recovering nicely from a postoperative standpoint and there have been no recurrent seizures . . . [she] will be released to work hopefully over the next four weeks." (Id.) Then on April 11, 2001 Dr. Riser stated that Strickland "has been advised not to work until at least May 22." (Id., April 11, 2001 letter of Dr. Riser.)

On or about June 12, 2001 Strickland filed a claim for long term disability, claiming disablement due to an "anterior cervical fusion 1-16-01, home 1-17 had Gran mal seizure." (See Ex. C., Initial Claim for Group Long Term Disability Benefits.) On July 16, Dr. Riser wrote to the insurer to confirm the disabled condition and assert the diagnosis as "status post anterior cervical fusion seizure disorder." (See Pl.'s Ex. 3; see also Ex. C., Attending Physician's Statement of Disability.)

---

[5] The physical therapy notes show that Strickland missed scheduled appointments, said her doctor said she should not exercise due to heart problems, canceled appointments, and was late for appointments. (See Ex. C., Rehabilitation Services Treatment Record.)

Dr. Riser indicated that the patient was functionally disabled and unable to be gainfully employed. (See Pl's Ex. 3.) Strickland's pain specialist, Dr. Goyne, also wrote to the insurer to explain the disability. (See Pl.'s Ex. 5.) That letter indicated that Strickland suffered from fibromyalgia, which would "definitely worsen" with activity. (See Pl.'s Ex. 6.) Both Dr. Goyne and Dr. Riser filled out forms on Strickland's ability to perform work related activities. (See Pl.'s Ex. 7.)

On or about October 22, 2001 Strickland underwent a hysterectomy. (See Ex. C., Operative Report from Brookwood Medical Center.) In December 2001, Provident performed a clinical review on Strickland's status. (See id., Clinical Review Request performed by York.) Karen York, RN, a Provident Clinical Review Consultant, determined after a review of the records that Strickland had reached the normal recovery time for the disc surgery and the hysterectomy and stated that "the medical information lacks medical evidence that would support the need for any additional recovery time." (Id.) On January 8, 2002 Becky Wallin, RN, performed another clinical review; based on the medical records, she was unable to determine the orthopaedic status of the claim and if the limitations were supported. (See id., Clinical Review Request of Wallin.)

Upon Wallin's failure to determine the status of the claim,

-8-

she sent the file to Dr. Robert C. Coddington for review; on January 10, 2002, Dr. Coddington stated "there is apparent good fusion of the neck post ACDF 1/16/01.  There is no follow up with her surgeon and fusion should have been solid and allowed her to RTW about mid July 00 with limitations . . . She would have had a period of temporary impairment due to the Hysterectomy in Oct 01, but this would be her OB-GYN surgeon's call . . . no current orthopaedic condition contributing to her symptoms is noted." (Id., Clinical Review Request of Coddington.)

Despite these earlier reviews of unsubstantiated claims, Provident paid Strickland's benefits claims from July 12, 2001 through September 20, 2002.[6]  (See Ex. B., Answer ¶ 1.)  However,

---

[6] The policy provides the following definition of disability:
"Covered persons are disabled if due to their sickness or injury they meet the following definition of disability:
OWN OCCUPATION DISABILITY DEFINITION
During the own occupation period, covered persons are disabled from their own occupation if due to their sickness or injury they: 1. are unable to earn at least the Own Occupation Income Level; or 2. are unable to perform each of the material duties of the occupation that they regularly perform for the employer . . ."
ANY OCCUPATION DISABILITY DEFINITION
During the any occupation period, covered persons are disabled from any occupation if due to their sickness or injury they: 1. are unable to earn at least the any Occupation Income Level while working in any occupation; or 2. are unable to perform each of the material duties of any occupation for which they are reasonably fitted by education, training or experience."
(Policy at 9.)
Based on the claim and medical information Strickland presented, Provident initially determined that Strickland was disabled during the own occupation period.  (See Ex. C., August 6, 2001 letter from Provident to Strickland.)

additional reviews of Strickland's record were performed in August 2002, which led to the conclusion that Strickland was no longer disabled as described by the plan.[7] The additional documents considered in making this decision included medical information received from Dr. Goyne of The Pain Clinic who began treating Strickland in January 2002 for fibromyalgia,[8] chronic pain, and seizures. (See Ex. C., medical opinions of Goyne.) On May 2, 2002 Dr. Goyne submitted restrictions and limitations stating that Strickland could: (1) sit for one to four hours a day; (2) stand for half an hour for five hours a day; (3) walk 0; (4) carry 0 pounds continuously; and (5) carry 10 pounds frequently and occasionally. (See id.) Also considered in the course of the August 2002 review was Dr. Riser's functional capacity form[9] and notes that Strickland was complaining of

---

[7] All benefits were discontinued as of September 20, 2002.

[8] On January 21, 2002 Dr. Goyne concluded that Strickland had probable fibromyalgia, an excellent response to surgery, and that her migraines were not significant but interstitial systitis presented a problem due to the frequency. (See Ex. C., medical opinion of Goyne.)

[9] Dr. Riser's functional capacity form dated August 9, 2002 states that Strickland could: (1) occasionally lift less than 10 pounds; (2) sit and stand less than 2 hours in an 8 hour day; (3) sit 20 minutes; (4) stand 20 minutes; (5) walk 20 minutes. The functional capacity form went on to state that Strickland was never to twist, stoop, crouch, or climb ladders, but that she could occasionally climb stairs. Strickland's functions of reaching, handling, fingering, feeling, pushing, and pulling are affected. She is restricted from extreme cold, heat, wetness, humidity, and noise as well as fumes, odors, dust, poor ventilation, and machinery and is expected to be absent from work

increasing headaches, neck pain, back pain, and sleeplessness.[10] (See id., medical opinions of Riser.)

In light of all of the available information, Dr. Coddington concluded: "there is no orthopaedic cause for her [Strickland's] ongoing complaints identified in the new information. She has pain symptoms in many areas with essentially normal MRI of the lumbar spine and normal neurological examination of the upper and lower extremities. Dr. Goyne . . . suggested she had fibromyalgia, and has treated her with pain medications . . . I do not understand her AP physician's opinion that this client can do no work of any kind . . ." (Ex. C., August 2002 notes of Coddington.) Dr. Robert Hill also performed an evaluation of Strickland's medical records. He stated that the medical records did not contain any physical exam findings or functional capacity testing to support the restrictions and that he did not find support for impairment in the medical records. (See id., medical notes of Hill.)

Based on all of this information, Provident determined and informed Strickland on September 20, 2002 and September 23, 2002

---

three times per month. Dr. Riser continues to state that Strickland is functionally disabled and unable to be gainfully employed. (See Ex. C., medical opinions of Riser.)

[10] The records show that a steroid injection helped the back pain which is markedly improved. She has lost weight, has had no seizures, and medication has helped the sleeplessness and headaches. (See id.)

-11-

that she was no longer disabled as defined by the policy. (See Ex. C., August 2002 Claim File Excerpts.) Plaintiff appealed that determination through Provident's internal procedures and attached to her appeal additional records including: medical records through October 10, 2002 and a functional capacity form from Dr. Goyne,[11] medical records through August 1, 2002 from Dr. Perry, and the Social Security Administration's benefits determination. (See id., Strickland's appeal.) Karen York, RN, reviewed all of the additional material and concluded that: "The claimant continues to report chronic pain. Her physical exams are essentially within normal limits with the majority of her symptoms being self-reported. The medical records lack clinical evidence to support the loss of functional capacity that she is claiming." (Pl.'s Ex. 12.) York also noted that the work restriction forms completed by Drs. Goyne and Riser contained

---

[11] The July 31, 2002 functional capacity form from Dr. Goyne stated that Strickland could: (1) occasionally lift 20 pounds with frequent lifting of 10 pounds; (2) stand and walk 4 hours of an 8 hour day; (3) sit and stand 20 minutes each without having to change positions; (4) walk 5 minutes at a time but needs the opportunity to shift at will from standing or walking; (5) need to lie down at unpredictable intervals. Dr. Goyne also stated in the functional capacity form that Strickland should not twist or crouch and should only occasionally stoop, climb chairs, or climb ladders. Dr. Goyne noted that Strickland's ability to reach and pull and push is affected, but her handling, fingering, or feeling is not affected. The doctor also noted that Strickland should not be exposed to extreme heat, cold, or noise, fumes, odors, gas, dust, or poor ventilation. Finally, Dr. Goyne stated that Strickland should be expected to be absent from work three times a month.

significantly different limitations. (See id.)

York referred the appeal information to Dr. Hill, who had previously reviewed the claim. After review, Hill stated: "The information documents the claimant's complaints, but nothing else. The file does not contain any physical exam findings or functional capacity testing to support the restrictions and limitations described." (Id., Hill review November 2002.) Becky Wallin, RN, also reviewed Strickland's appeal file. Upon review, Wallin stated: "Physical examination findings that are provided are minimal and essentially are related to tenderness noted to palpation in various areas of her [Strickland's] body. There does not appear to be a significant change in the claimant's status since the prior clinical review and the updated records provided still do not appear to identify any problems associated with an orthopaedic impairment." (Id., Clinical Review Request November 2002.) Wallin also pointed out that even though Strickland complained of "gripping pain," she refused to transition to "long acting medications like OxyContin or Duragesic patches as suggested by Dr. Goyne." (Id.)

Dr. Coddington also reviewed the appeal documents. He stated: "The client's status post cervical diskectomy and fusion is that of decreased pain and no radiculopathy. This is better than pre-op. The low back pain is not associated with and clinical findings of weakness, sensory, or reflex changes. The

MRI of the lumbar area was normal.  The only positive finding is pain to palpation, but she [Strickland] has a whole series of pain to palpation areas associated with her diagnosis of fibromyalgia."  (<u>Id.</u>, November 2002 review of Coddington.)

Consequently, on March 4, 2003, after completing the review of Strickland's appeal, Provident notified Strickland by letter that her appeal had been denied because she was not disabled within the meaning of the own occupation definition of disability.  (<u>See id</u>., letter from Pioneer to Strickland.)  On April 3, 2003 Strickland called Provident and stated that her employer had sent her a letter offering her job back if she would respond by April 9, 2003.  (<u>See id.</u>, claim file doc. dated April 3, 2003.)  Strickland again stated that she did not think she could do her job.  (<u>See id.</u>)

### IV. Applicable Substantive Law and Analysis

Plaintiff Strickland claims that Provident failed to properly investigate her disability claim and that she is entitled to benefits under Provident's plan for long term disability.  (<u>See generally</u> Compl. and Amend. Compl.)  This claim as articulated is governed by the Employee Retirement Income Security Program ("ERISA"), 18 U.S.C. § 1001 et seq.

The Eleventh Circuit has adopted three possible standards of review for plan decisions: (1) *de novo*, applicable where the administrator is not afforded discretion; (2) arbitrary and

capricious when the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion but there is a conflict of interest. See Buckley v. Metropolitan Life, 115 F.3d 936, 939 (11th Cir. 1997). Where, as here, the benefit plan gives the administrator authority to determine eligibility for benefits or construe terms of the plan,[12] the court only determines whether the administrator's decision was arbitrary and capricious; that is, the court determines whether a reasonable basis appears for the administrator's decision. See Jett v. Blue Cross & Blue Shield of Alabama, 890 F.2d 1137, 1140 (11th Cir. 1989); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If such a reasonable basis is present, the court must conclude that the administrator's decision was not arbitrary and capricious, even if there is evidence that would support a contrary decision.[13] See Jett, 890 F.2d at 1140.

---

[12] See Ex. B. to the Notice of Removal, Policy at 3, 22. There is no evidence on the record to suggest that the administrator has a substantial financial interest in the decision, in which case the fiduciary would have to prove that the interpretation of the plan provision committed to its discretion was not tainted by self-interest. See Brown v. Blue Cross, 898 F.2d 1556, 1566-67 (11th Cir. 1990). The parties to the instant case make no argument of conflict of interest, and therefore this court will proceed with the analysis using the arbitrary and capricious standard. See Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1325-26 (11th Cir. 2001).

[13] This decision is made on the basis of only the evidence that was before the administrator. See Jett, 890 F.2d at 1140. If the claimant desires to present additional information that

The application of the arbitrary and capricious standard of review to the instant case requires this court to determine only whether the administrator acted reasonably in denying Strickland benefits after September 20, 2002.[14]  See Jett, 890 F.2d at 1139. Under the plan at issue, an employee may qualify for long term disability if she is unable to earn the own occupation income level or if she is unable to perform each of the material duties of the occupation she normally performs; an employee is disabled under the any occupation disability definition if she is unable to earn at least the any occupation income level or if she is unable to perform each of the material duties of any occupation.

---

might affect the determination of eligibility for benefits, the proper course is to remand the matter to the administrator for a new determination.  See id. at 1140.

[14] There is no question that the administrator acted reasonably prior to September 2002.  In making the initial determination to award Strickland benefits under the plan, the administrator considered: (1) the performing surgeon's progress notes which indicated that Strickland's symptoms were improving and that the fusion was incorporating well; (2) physical therapy notes indicating that Strickland missed and canceled appointments; (3) the neurologist's notes indicating that Strickland would be released to work in a matter of weeks; (4) the same neurologist's letter dated four months after the original note indicating that Strickland was functionally disabled; (5) the pain specialist's letter indicating that Strickland's symptoms would worsen; (6) the clinical review performed by York indicating that Strickland had reached the normal recovery time for her condition; (7) the indeterminate review of Wallin; and (8) the review performed by Coddington stating that there exists "no current orthopaedic condition contributing to her symptoms."  Despite the fact that some of this medical evidence was contradictory, Provident paid Strickland disability benefits through September 2002.

(See Pl.'s Brief and Evidentiary Submission in Opp'n. to Def.'s Motion for Summ J. at 1-2.) A reasonable analysis of whether Strickland meets the disability definition must be performed by Provident as plan administrator before denying any long term disability benefits.

Before Provident discontinued payment of disability benefits to Strickland, several reviews of medical evidence pertaining to Strickland's claim were completed. Considered in the course of the August 2002 review were: (1) contradictory statements of restrictions and limitations submitted by Drs. Goyne and Riser; (2) Coddington's evaluation of the claim file indicating his confusion with doctors' notes indicating Strickland could not perform work of any kind; and (3) Hills' evaluation of Strickland's claim indicating that the claimant's file did not contain any support for the restrictions as claimed. Based on this available information, and after paying Strickland's claim for several months, Provident determined that Strickland was no longer disabled as defined by the plan.

On Strickland's appeal of the denial of benefits, the plan administrator again performed a thorough review of all of the evidence, including all additional evidence submitted on appeal. Provident's clinical review consultant noted that while Strickland continued to complain of chronic pain, "the medical records lack clinical evidence to support the loss of functional

capacity that she [Strickland] is claiming." It is not unreasonable that Provident discounted the claimant's subjective reports of pain. In <u>Archible v. Metropolitan Life Ins. Co.</u>, 85 F.Supp.2d 1203, 1219 (S.D. Ala. 2000), the court rejected an insured's physicians' opinions regarding disability where the opinions were based on subjective pain complaints of the insured. The court stated that it would give "no weight or credence whatsoever to [the insured's] conclusory disability opinions . ." <u>Id.</u>

The appeal review also again noted the inconsistencies between the functional capacity forms submitted by Drs. Goyne and Riser. Three additional consultants for Provident agreed with the opinion that the medical records did not support the limitations, and that the condition was "better than pre-op." However, Provident did not discount the opinions of the treating physicians completely, though there is no "heightened burden of explanation on administrators when they reject a treating physician's opinion" nor does ERISA require plan administrators to accord special deference to the opinions of treating physicians." <u>The Black & Decker Disability Plan v. Kenneth L. Nord</u>, 2003 WL 21210418, at *4 (U.S. S. Ct. May 27, 2003);[15] <u>see</u>

---

[15] In <u>Black & Decker</u>, the claimant was denied disability benefits. 2003 WL 21210418, at *4. His treating physicians stated that he suffered from degenerative disc disease and chronic pain that rendered him unable to work. <u>See</u> <u>id.</u> A separate neurologist concluded that the claimant could perform

also <u>Jett</u>, 890 F.2d at 1139-40. Provident examined the functional capacity forms submitted by the claimant's physicians, indicating in substance that Strickland should be able to return to full-time work.[16]  (<u>See</u> Pl.'s Ex. 12.)

In accordance with the evidence, Provident was and is of the opinion that Strickland would be able to perform her job, only with certain accommodations.[17]  This is not an arbitrary and capricious decision.  There is simply no evidence to dispute Provident's contention that the insurer performed a thorough evaluation of Strickland's claim.  Therefore, defendant's motion for summary judgment is due to be granted.

DONE this __3rd__ day of August, 2004.

```
                              /s/ James H. Hancock
                              _____
                              SENIOR UNITED STATES DISTRICT JUDGE
```

---

sedentary work if aided by medication.  <u>See</u> <u>id.</u>

[16] In fact, the most recent letter on file from Dr. Goyne does not state that Strickland is disabled, only that she has certain restrictions.  (<u>See</u> Pl.'s Ex. 12.)

[17] A reasonable accommodation for the claimant would be to allow her the ability to stand up or walk periodically.  (<u>See</u> Def.'s Submission in Support of Motion for Summ. J. at 15.)